19 P.3d 650

**CITY OF TUCSON, a municipal corporation, Plaintiff–Appellee,**

v.

**PIMA COUNTY, a political subdivision of the State of Arizona; Mike Boyd, Sharon Bronson, Raymond Carroll, Dan Eckstrom and Raul Grijalva, in their official capacities as Members of the Pima County Board of Supervisors, Defendants–Appellants,**

**The Committee to Incorporate the Town of Tortolita, Defendant–Intervenor–Appellant.**

**The Committee to Incorporate the Town of Tortolita; Town of Tortolita; Cheryl L. Wiener; Ronald K. Wiener; Joan L. Eerkes; David L. Eerkes, Counterclaimants–Appellants,**

v.

**State of Arizona; City of Tucson, a municipal corporation; Town of Oro Valley, a municipal corporation, Counterdefendants–Appellees.**

No. 1 CA–CV 00–0411.

Court of Appeals of Arizona, Division 1, Department B.

March 15, 2001.

Review Denied April 26, 2001.

mits a double recovery of taxable costs over and above those recoverable pursuant to § 12–341.

Anthony B. Ching, Tempe, Attorney for Appellants Pima County and Members of its Board of Supervisors.

Risner & Graham by William J. Risner, Tucson, Attorneys for Appellants Committee to Incorporate the Town of Tortolita, Town of Tortolita, Cheryl L. Wiener, Ronald K. Wiener, Joan L. Eerkes and David L. Eerkes.

Michael D. House, Tucson City Attorney by Dennis P. McLaughlin, Principal Assistant City Attorney, Tucson, and Ulrich & Anger, P.C. by Paul G. Ulrich, Phoenix, Attorneys for Appellee City of Tucson.

Frank Cassidy, P.C. by Frank Cassidy, Tucson, and Dan Dudley, Town Attorney, Town of Oro Valley, Oro Valley, Attorneys for Appellee Town of Oro Valley.

Janet A. Napolitano, Attorney General by Eva K. Bacal, Assistant Attorney General, Tucson, Attorney for Appellee State of Arizona.

## OPINION

EHRLICH, Judge.

¶ 1 The ultimate issue presented by this case is whether it is constitutional for the Arizona state legislature to require the consent of a proximate municipality before an area may incorporate. We conclude that the statute requiring such permission as a predicate to municipal incorporation, ARIZ.REV. STAT. ("A.R.S.") § 9–101.01(B)(1) (1996), is constitutional, and we therefore affirm the superior court's judgment dismissing the appellants' contrary contentions.

### FACTS and PROCEDURAL HISTORY

¶ 2 Since 1961, A.R.S. sections 9–101 (Supp.2000) and 9–101.01 have outlined the procedure for a municipality's incorporation. See City of Tucson v. Woods, 191 Ariz. 523, 959 P.2d 394 (App.1997), review denied; Snyder v. Lena, 145 Ariz. 583, 703 P.2d 527 (App.1985), review denied. Section 9–101(A) provides that, when two-thirds of the electors residing in a community properly petition their county's board of supervisors for incorporation of that community, the board shall incorporate the community as a city or a town. Subsection B of the same statute offers an alternative that, if ten percent of the electors within the community petition the board, the board shall order an election on the issue of the community's incorporation.

¶ 3 However, A.R.S. section 9–101.01 modifies these procedures if an "urbanized area" is involved. That statute states, in relevant part:

A. Notwithstanding any other provision of law to the contrary, all territory within six miles of an incorporated city or town, as the same now exists or may hereafter be established, having a population of five thousand or more as shown by the most recent federal census, and all territory within three miles of any incorporated city or town, as the same now exists or may hereafter be established, having a population of less than five thousand as shown by the most recent federal census is declared to be an urbanized area.

B. No territory within an urbanized area shall hereafter be incorporated as a city or town, and the board of supervisors shall have no jurisdiction to take any action upon a petition to incorporate a city or town within such area, unless:

1. There is submitted with the petition for incorporation a resolution adopted by the city or town causing the urbanized area to exist approving the proposed incorporation; or

2. There is filed with the board of supervisors an affidavit stating that a proper and legal petition has been presented to the city or town causing the urbanized area to exist requesting annexation of the area proposed for incorporation and such petition has not been approved by a valid ordinance of annexation within one hundred twenty days of its presentation.

¶4 In April 1997, the Arizona Legislature enacted Laws 1997, Chapter 204, Section 2 ("1997 Law"), the sole purpose of which was to suspend the consent requirement of A.R.S. section 9–101.01(B)(1) in Pima County between July 21, 1997, and July 15, 1999. This prompted the proponents of incorporating the areas known as Tortolita and Casas Adobes to file incorporation petitions with the Pima County Division of Elections.[1] Both Tortolita and Casas Adobes are within the relevant distance of the City of Tucson and the Towns of Marana and Oro Valley to qualify as "urbanized areas." Tucson responded by immediately filing a complaint in Pima County Superior Court challenging the 1997 Law as a special or local law barred by the Arizona Constitution.

¶5 The superior court ruled that the 1997 Law was constitutional. Thus, the members of the Pima County Board of Supervisors, relying on the 1997 Law and therefore without the consent otherwise required by A.R.S. section 9–101.01(B)(1), declared Tortolita incorporated and called for an incorporation election for Casas Adobes.

¶6 Shortly thereafter, though, we concluded in *Woods* that the 1997 Law was a special or local law contrary to the Arizona Constitution, Article 4, Part 2, Section 19. 191 Ariz. at 528–32, 959 P.2d at 399–403. This voided the incorporation processes for Tortolita and Casas Adobes, and the case was remanded to the superior court for further proceedings.

¶7 As those proceedings continued, the case again was brought to this court by petition for special action review. *City of*

*Tucson v. Alfred (Pima County)*, 1 CA–SA 98–0281 (Dec. Order, Nov. 24, 1998). Accepting jurisdiction but denying relief, we ruled that the superior court had correctly interpreted the opinion in *Woods* to permit federal constitutional challenges to A.R.S. section 9–101.01 to be presented by Pima County, the Pima County Board of Supervisors, the Committee to Incorporate [the Village of Casas Adobes] and the Committee to Incorporate the Town of Tortolita. *Id.*

¶8 Upon further proceedings, the superior court issued a series of thoughtful and thorough minute entries. It declared that the Town of Oro Valley was permitted to intervene; that Pima County, the members of its Board of Supervisors, Tortolita and Casas Adobes lacked standing to bring federal constitutional claims challenging a state statute; that the Committee to Incorporate the Town of Tortolita, Cheryl L. Wiener, Ronald K. Wiener, Joan L. Eerkes and David L. Eerkes lacked standing and a justiciable claim of a violation of the Guaranty Clause of the United States Constitution; that the Committee to Incorporate [the Village of Casas Adobes], Jane Madden, Scott Nelson and Lowell Lowe, and the Committee to Incorporate the Town of Tortolita, Cheryl L. Wiener, Ronald K. Wiener, Joan L. Eerkes and David L. Eerkes lacked standing to challenge A.R.S. section 9–101.01(B)(2); and that claims against the State of Arizona pursuant to 42 United States Code section 1983 filed by the Committee to Incorporate [the Village of Casas Adobes], Madden, Nelson and Lowe were not permitted because of the Eleventh Amendment to the United States Constitution. The court refused to consider whether Tucson's decision not to consent to Tortolita's incorporation was one of bad faith because such an inquiry would require an examination of the motivation of the legislative branch by the judicial branch of government, an inquiry barred by the state and federal constitutional requirements of the separation of powers among the three branches of government.

---

1. The incorporation declaration for Tortolita was governed by the requirements of A.R.S. section 9–101(A) because the incorporation proponents gathered petitions signed by more than two-thirds of the eligible electorate. The incorporation election of Casas Adobes was governed by section 9–101(B) because the proponents of its incorporation gathered petitions signed by more than ten percent of that electorate.

¶9 Ultimately, the superior court held that A.R.S. section 9–101.01(B)(1) is constitutional because it neither violates federal constitutional guarantees of equal protection, procedural or substantive due process, the "right to self-determination" or any of the rights enshrined by the First Amendment to the United States Constitution, nor does it have an adverse impact on the right to vote. Rather, the court concluded, it bears a rational relationship to a legitimate state interest against the Balkanization of its counties. Accordingly, judgment was granted in favor of Tucson, the State and Oro Valley. It is from this judgment that there now is a further appeal, presenting the following issues:

1. Whether Pima County and Tortolita have standing;

2. Whether the superior court abused its discretion by permitting Oro Valley to intervene;

3. Whether A.R.S. section 9–101.01(B)(1) violates the voting-rights doctrine of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

4. Whether there has been a violation of the appellants' right to petition the government for a redress of their grievances pursuant to the First Amendment to the United States Constitution; and

5. Whether Tucson acted in bad faith in refusing to consent to Tortolita's incorporation.

## DISCUSSION

### A. Standing of Pima County and Tortolita

¶10 Tucson argues that, as state political subdivisions, Pima County and Tortolita are without standing to challenge the constitutionality of A.R.S. section 9–101.01. "Whether appellants have standing to sue is a question of law we review de novo." *Alliance Marana v. Groseclose*, 191 Ariz. 287, 289, 955 P.2d 43, 45 (App.1997).

¶11 The issue of standing is not jurisdictional in Arizona but, rather, "solely a rule of judicial restraint." *Woods*, 191 Ariz. at 526 n. 2, 959 P.2d at 397 n. 2; *see Armory Park Neighborhood Ass'n v. Episcopal Community Servs.*, 148 Ariz. 1, 6, 712 P.2d 914, 919 (1985); *Alliance Marana*, 191 Ariz. at 289, 955 P.2d at 45. We invoke the doctrine of standing to ensure that we do not issue advisory opinions, that the case is not moot and that the issues will be fully developed. *Woods*, 191 Ariz. at 526, 959 P.2d at 397. Therefore, a party must have a "direct stake" in the outcome of the case in order to have standing. *Id.*

¶12 Just as we held in *Woods* that Tucson had a direct stake in determining whether the 1997 Law was constitutional, *id.*, so too does Pima County have a direct stake in determining whether A.R.S. section 9–101.01(B)(1) is constitutional. Accordingly, Pima County has standing.

¶13 Tortolita is a different matter because we decided in *Woods* that it never was validly incorporated, and, therefore, it does not exist. However, if we deny it standing, the would-be town cannot challenge the constitutionality of the very statute, A.R.S. section 9–101.01, which governs its incorporation. Our resolution of this quandary is to treat Tortolita as existing insofar as its electors complied with the statute for the purpose of challenging the constitutionality of the statute.

¶14 Furthermore, even if Pima County and Tortolita lack standing, there remain parties with unequivocal standing who offer the same arguments. Thus we address the constitutional challenges to A.R.S. section 9–101.01. *See Cutter Aviation, Inc. v. Arizona Dep't of Revenue*, 191 Ariz. 485, 493–94, 958 P.2d 1, 9–10 (App.1997) (assuming county lacked standing, court could address challenge to statute in order to conserve judicial resources).[2]

---

**2.** Hereafter, a reference to "Pima County" will refer also to the members of the Pima County Board of Supervisors. Similarly, we will refer to the Town of Tortolita, the Committee to Incorporate the Town of Tortolita, Cheryl L. Wiener, Ronald K. Wiener, Joan L. Eerkes and David L. Eerkes collectively as "Tortolita."

## B. Intervention of Oro Valley

¶ 15 Tortolita complains that the superior court should not have permitted Oro Valley to intervene. We review the propriety of the court's decision for an abuse of its discretion. *Purvis v. Hartford Acc. and Indem. Co.,* 179 Ariz. 254, 257, 877 P.2d 827, 830 (App.1994) (whether to grant a motion to intervene as a permissive matter is a decision within the superior court's discretion).

¶ 16 To protect interests similar to those of Tucson, Oro Valley sought to intervene in the litigation upon remand from this court. For reasons comparable to those we expressed with regard to Tucson in *Woods,* 191 Ariz. at 525–26, 959 P.2d at 396–97, the superior court did not abuse its discretion in allowing Oro Valley to participate.

¶ 17 Even if the superior court had erred, the error would have been harmless. Because of the correspondence between Oro Valley's involvement and that of Tucson, there was no prejudice to Tortolita in allowing the intervention of Oro Valley. *Purvis,* 179 Ariz. at 259, 877 P.2d at 832.

## C. Equal Protection and the Right to Vote for Municipal Incorporation

¶ 18 The appellants contend that A.R.S. section 9–101.01(B) violates the voting-rights doctrine of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. The specific argument is that the petition process of A.R.S. section 9–101 triggers a fundamental right to vote and that the consent requirement in section 9–101.01(B) unconstitutionally burdens this right by giving a veto to the city or town that caused the urbanized area to exist. The constitutionality of a statute is a question of law we review de novo. *City of Tucson v. Rineer,* 193 Ariz. 160, 164 ¶ 12, 971 P.2d 207, 211 (App.1998).

¶ 19 There is no constitutional right to vote for municipal incorporation. *Hussey v. City of Portland,* 64 F.3d 1260, 1263 (9th Cir.1995) ("There is no federal constitutional right to vote on municipal annexations.") (Citation omitted.), *cert. denied,* 516 U.S. 1112, 116 S.Ct. 911, 133 L.Ed.2d 843 (1996); *see Harris v. McRae,* 448 U.S. 297, 322 n. 25, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) ("[T]he Constitution of the United States does not confer the right to vote in state elections."); *San Antonio Ind. School Dist. v. Rodriguez,* 411 U.S. 1, 35 n. 78, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) ("[T]he right to vote, per se, is not a constitutionally protected right."); *Sailors v. Board of Education,* 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967) (There is no due process right to vote on a proposed municipal annexation.); *Hunter v. City of Pittsburgh,* 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907)(same). Rather, the state has very broad powers to establish municipalities and manage their growth because the cities and towns are no more than political entities created as the legislature deems wise. *Hunter,* 207 U.S. at 178–79, 28 S.Ct. 40; *Goodyear Farms v. City of Avondale,* 148 Ariz. 216, 218, 714 P.2d 386, 388 (1986).

> Municipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be intrusted to them.... The number, nature, and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the state.... The state, therefore, at its pleasure, may ... take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality.... *All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest.* In all respects the state is supreme, and its legislative body, conforming its action to the state Constitution, may do as it will, unrestrained by any provision of the Constitution of the United States.

*Hunter,* 207 U.S. at 178–79, 28 S.Ct. 40 (emphasis added); partially quoted in *Goodyear,* 148 Ariz. at 218, 714 P.2d at 388; *see also Hess v. Port Authority Trans–Hudson Corp.,* 513 U.S. 30, 47, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994) ("[U]ltimate control of every state-created entity resides with the State, [which] may destroy or reshape any unit it creates.

Political subdivisions exist solely at the whim and behest of their State.") (Citation omitted.); *Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 70–71, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978) (affirming vitality of *Hunter,* although recognizing its limitation in other contexts such as that of *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), discussed below).

¶ 20 In a manner consistent with this hierarchy of political entities, the Arizona Constitution in Article 13, Section 1, gives the legislature plenary power over the "methods and procedures for [municipal] incorporation." *State ex rel. Pickrell v. Downey,* 102 Ariz. 360, 363, 364–65, 430 P.2d 122, 125, 126–27 (1967); *see Territory v. Town of Jerome,* 7 Ariz. 320, 326, 64 P. 417, 418 (1901) (state has absolute power to "create, enlarge and restrict municipal franchises"). Thus, those persons seeking municipal incorporation are "mere supplicants, with no rights beyond those which the legislature [sees] fit to give them." *Burton v. City of Tucson,* 88 Ariz. 320, 326, 356 P.2d 413, 417 (1960), citing *Hunter,* 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151. Furthermore, the "legislature may delegate to a subordinate body" discretion over the procedures for municipal incorporation. *Pickrell,* 102 Ariz. at 363, 430 P.2d at 125; *see City of Tucson v. Garrett,* 77 Ariz. 73, 267 P.2d 717 (1954) (legislature may delegate to municipality total discretion whether to grant or deny annexation); *Skinner v. City of Phoenix,* 54 Ariz. 316, 320–21, 95 P.2d 424, 426 (1939) (legislature free to delegate this power to existing cities and towns "upon such terms as [it] may think proper"); *see also Holt,* 439 U.S. at 70–71, 74, 99 S.Ct. 383 (State has "extraordinarily wide latitude ... in creating various types of political subdivisions and conferring authority upon them."). With that understanding, we consider the voting-rights doctrine of the Equal Protection Clause.

¶ 21 As a general proposition, absent a suspect classification or fundamental interest, review pursuant to the Equal Protection Clause is limited to whether a statute is rationally related to a legitimate state purpose. *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); *see Martin v. Reinstein,* 195 Ariz. 293, 309–10 ¶ 52, 987 P.2d 779, 795–96 (App.1999), *review denied.* But, once an election is provided, classifications between and among electors within a voting district are subject to heightened scrutiny if it is alleged that some portion of that electorate is favored. *See City of Phoenix v. Kolodziejski,* 399 U.S. 204, 208–13, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970) (franchise in city general-obligation bond elections could not be limited to property-holding taxpayers); *Cipriano v. City of Houma,* 395 U.S. 701, 706, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969) (franchise could not be limited to property owners in revenue bond election); *Kramer,* 395 U.S. at 626–27, 633, 89 S.Ct. 1886 (although no right to have school-board election, once election set, right to vote could not be limited to property owners and parents of school-children); *compare with Goodyear,* 148 Ariz. at 218, 714 P.2d at 388 (refusing to apply heightened scrutiny to annexation petition process because process not sufficiently analogous to voting), *and Sherwood School Dist. v. Washington County Educ. Service Dist.,* 167 Or.App. 372, 6 P.3d 518, 531 (because no election provided to determine school-district boundary, only rational basis test applied), *rev. denied,* 331 Or. 361, 19 P.3d 354 (2000).

¶ 22 The *Goodyear* case involved a statute requiring that petitions be signed by at least one-half of the affected property owners before a city could annex an area by ordinance. 148 Ariz. 216, 714 P.2d 386. The petitions were not determinative of annexation but, rather, advisory to the city regarding its decision whether to annex the area. The Arizona Supreme Court held that this petition process was not comparable to voting and, therefore, that it did not trigger the voting-rights doctrine's requirement of heightened scrutiny, but, rather, would be analyzed according to the rational-basis standard. *Id.* at 219–22, 714 P.2d at 389–92, citing *Carlyn v. City of Akron,* 726 F.2d 287 (6th Cir.1984); *Berry v. Bourne,* 588 F.2d 422 (4th Cir.1978); *Township of Jefferson v. City of West Carrollton,* 517 F.Supp. 417 (S.D.Ohio 1981), aff'd. 718 F.2d 1099 (6th Cir.1983); *Doenges v. City of Salt Lake City,*

614 P.2d 1237 (Utah 1980); *Torres v. Village of Capitan,* 92 N.M. 64, 582 P.2d 1277 (1978). A similar rationale applies to this case.

¶ 23 As was true in *Goodyear,* the petitions requesting a declaration of incorporation or an election for that purpose, like those for a municipal annexation of an area, are not determinative but only a prerequisite for action by the legislative body, the city in *Goodyear* and the county board of supervisors in this case. The difference as argued by the appellants is that the petitions were advisory in *Goodyear* whereas, in this case, the petitions require the board of supervisors to act. That is only partially true, though, because the filing of lawful petitions is but one of two prerequisites for legislative action. In other words, there are two statutory prerequisites before the county board of supervisors may proceed to declare or to call an election to declare an area incorporated: the requisite number of lawful petitions and the agreement of the neighboring city or town. The petitions themselves are of no effect. Only if and when both of the statutory conditions are met will there be legislative action. Thus, as was true in *Goodyear,* the petition process does not in any legally significant sense equate to an election.

¶ 24 The appellants rely upon *Curtis v. Board of Supervisors,* 7 Cal.3d 942, 104 Cal. Rptr. 297, 501 P.2d 537 (1972). As the opinion was summarized by its author,

> When persons owning a majority of assessed valuation of land within the proposed City of Rancho Palos Verdes filed a written protest, the Los Angeles County Board of Supervisors, pursuant to Government Code section 34311, refused to call an incorporation election. The crux of petitioners' plea to us is that section 34311 violates the Constitution; upon this basis they seek [a] mandate to compel the board to resume incorporation proceedings. We have concluded that the section is, indeed, unconstitutional under the equal protection clause of the Fourteenth Amendment to the United States Constitution and the correlative provisions of the California Constitution.

*Id.* 104 Cal.Rptr. 297, 501 P.2d at 539. The court decided that the landowner-veto provision burdened voting and could not be justified by a compelling reason. *Id.* 104 Cal. Rptr. 297, 501 P.2d at 546–550.

¶ 25 The *Curtis* case is not analogous for the reasons given by the court in *Goodyear.* 148 Ariz. at 220–21, 714 P.2d at 390–91. In *Curtis,* there was an actual election provided by statute, which election could be vetoed by property owners, i.e., the law "dealt with election procedures, whereas [*Goodyear* ] involves petitioning procedures to an executive body performing a delegated legislative duty." *Id.* at 221, 714 P.2d at 391 (citation omitted).

¶ 26 For similar reasons as distinguish *Curtis,* the petition process at issue differs substantially from that in *Hussey,* 64 F.3d 1260, upon which the appellants also rely. In *Hussey,* the court of appeals ruled unconstitutional a Portland ordinance which reduced sewage rates for those outside the city limits who would sign annexation petitions but not for those who refused to sign the petitions. In Oregon, municipal annexations could take place by a majority election or through petitions signed by a majority of voters and landowners. These petitions stated that, if Portland attempted to annex the Mid–County area by election, "this agreement constitutes a waiver of the right to vote ... [and] such persons shall count as yes votes." The court concluded that to affix a signature to a petition worded as was this one was the equivalent of voting; thus, it applied heightened scrutiny. *Id.* at 1263–66. But the Oregon procedure for municipal annexation bears no resemblance to that provided by A.R.S. sections 9–101 and 9–101.01, which do not suggest that signatures affixed to a petition in favor of incorporation constitute "waiver[s] of the right to vote ... [and] as yes votes."

¶ 27 In *Sherwood,* the Oregon Court of Appeals distinguished *Hussey* on the basis that, since the government had "authorized an election, it could not condition the right to vote *in that election* without a compelling justification." 6 P.3d at 530 (emphasis original). The background of the case was that the Oregon legislature once had determined that the location of a school boundary in a specific area would be decided by an election;

but it had changed its collective mind. The court said, "[s]imply because the legislature determines to grant the people the power to vote on the issue does not mean that the legislature cannot change its mind and exercise its constitutional authority to decide the matter for itself." *Id.; see Hunter*, 207 U.S. at 178–79, 28 S.Ct. 40. Similarly, the Arizona legislature could and did grant the right to petition and vote for incorporation pursuant to A.R.S. section 9–101, but, by passage of section 9–101.01, while not "chang[ing] its mind," it made an election contingent upon the consent of a neighboring municipality.

¶ 28 The appellants then argue that the Equal Protection Clause is violated because only those within the "urbanized area" need to acquire a city's consent. They also contend that, if this proposition is rejected, Pima County ought to be considered the relevant voting area and that the classification requiring those within the six-mile range to obtain consent discriminates within Pima County.

■ ¶ 29 The Equal Protection Clause does not preclude the establishment of distinct classes within a geographic area if the classifications are reasonably related to a legitimate state interest and all persons within the class are treated equally. *Martin*, 195 Ariz. at 309 ¶ 50, 987 P.2d at 795. This is not the type of unlawful classification at issue in *Curtis, Kramer* or *Hussey*. All persons within the area which is the object of incorporation are treated equally, whereas, in each of those cases, there was an election provided, and certain groups of persons within the given area were either denied the right to vote or had a burden placed upon their ability to vote. In *Curtis*, the right to veto a vote for incorporation was limited to property owners. 104 Cal.Rptr. 297, 501 P.2d at 546–550. Indeed, the court differentiated between its case, wherein property owners in the election area unlawfully had a veto, and the situation presented here, wherein the legislature delegates the power to determine if an election should occur. *Id.* 104 Cal.Rptr. 297, 501 P.2d at 546 n. 17. In *Kramer*, the right to vote was limited to property owners and parents of school-children. 395 U.S. at 626–27, 633, 89 S.Ct. 1886. In *Hussey*, the ordinance was comparable to

a poll tax which disproportionately affected the poor. 64 F.3d at 1265–66. *Compare Hawkins v. Johanns*, 88 F.Supp.2d 1027, 1042–47 (D.Neb.2000) ("Unlike *Kramer*, the plaintiffs do not claim that some citizens within Class I [school] districts have voting rights that other citizens within those same Class I districts do not enjoy."); *and Sherwood*, 6 P.3d at 530–31 (In *Kramer* and *Hussey*, "there was an election, and the government entities unlawfully imposed qualifications on who could vote *in that election.* That is not what happened in this case, in which the legislature has determined that a particular issue . . . in a particular geographic area simply will not be decided by an election at all." (emphasis original)); *with Kolodziejski*, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523; *Cipriano*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647; *Kramer*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583; *Hussey*, 64 F.3d at 1263–65; *and Curtis*, 104 Cal.Rptr. 297, 501 P.2d at 546–50.

¶ 30 Given that no improper distinction is being made by the Arizona legislature between and among classes of persons within the relevant area, the statute does not implicate, let alone burden, the Equal Protection Clause's right to vote. Accordingly, we analyze the statutory scheme of A.R.S. sections 9–101 and 9–101.01 using a rational-basis standard. *See Holt*, 439 U.S. at 68, 99 S.Ct. 383 ("No decision of this Court has extended the 'one man, one vote' principle to individuals residing beyond the geographic confines of the governmental entity concerned, be it the State or its political subdivisions."); *McGowan v. Maryland*, 366 U.S. 420, 427, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) ("[T]erritorial uniformity is not a constitutional prerequisite."); *Reeder v. Kansas City Bd. of Police Comm'rs*, 796 F.2d 1050, 1053 (8th Cir.1986) ("[T]he Supreme Court has long held that when the state chooses to regulate differentially, with the laws falling unequally on different geographic areas of the state, the Equal Protection Clause is not violated . . . so long as all persons within the jurisdictional reach of the statute are equally affected by the law . . . ."), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 1000 (1987); *Sherwood*, 6 P.3d at 531 (allowing persons in some, but not all, areas to vote on school-

district boundaries because, "[u]nder the Fourteenth Amendment, differentiation on the basis of geographic location is subject to rational basis analysis only."); *see also Adams v. City of Colorado Springs,* 308 F.Supp. 1397, 1404 (D.Colo.), *aff'd,* 399 U.S. 901, 90 S.Ct. 2197, 26 L.Ed.2d 555 (1970) (statute allowing annexation election for areas with less than two-thirds contiguity with municipality but not for areas with more than two-thirds contiguity valid under equal protection); *Weber v. City Council of Thousand Oaks,* 9 Cal.3d 950, 109 Cal.Rptr. 553, 513 P.2d 601, 608–10 (1973) (statute allowing for annexation election in areas with more than twelve voters but not for areas with fewer voters valid).

¶ 31 The state, as was said above, has the power to shape municipalities and to protect the interests of those within existing cities and towns concerning the formation of new political subdivisions. As the superior court concluded, paraphrasing *Snyder,* 145 Ariz. at 585, 703 P.2d at 529:

> It is obvious from the reading of [section] 9–101.01 that the intent of the legislature in enacting it was to grant some control to existing cities and towns with regard to proposed incorporations of areas close to their boundaries. The result of [appellants'] construction would be a proliferation of small towns within a short distance of large cities and the attendant inefficient and uneconomical provision of government services. That does not appear to have been the intent of the legislature.

And, as had the court in *Snyder,* we noted in *Woods* that the intent of A.R.S. section 9–101.01 was "for orderly development and efficient municipal administration." 191 Ariz. at 530, 959 P.2d at 401. "The very purpose of section 9–101.01 is to protect cities and towns from problems that may flow from the existence of many separate governmental entities in a limited geographical area." *Id.* at 526, 959 P.2d at 397; *see Goodyear,* 148 Ariz. at 222–23, 714 P.2d at 392–93; *see also Holt,* 439 U.S. at 70–75, 99 S.Ct. 383 (protecting a municipality's interests is a rational basis and city's "governance without the franchise" over outlying area did not violate equal protection); *Town of Lockport v. Citizens For Community Action,* 430 U.S. 259, 268–69, 97 S.Ct. 1047, 51 L.Ed.2d 313 (1977) (state could require county charter approval by both a majority of voters within cities and a separate majority of voters outside of cities because each area had distinct interests in outcome); *Hunter,* 207 U.S. at 178–79, 28 S.Ct. 40; *Carlyn,* 726 F.2d at 290; *Berry,* 588 F.2d at 424. In this case, given the obvious political and economic implications of consolidation, the incorporation of areas such as Tortolita and Casas Adobes was made subject to the consent of those in contiguous areas of Pima County: the Towns of Marana and Oro Valley, and the City of Tucson. The policy embodied by A.R.S. section 9–101.01 bears a rational relationship to a legitimate state interest and so does not violate the Equal Protection Clause.

### D. First Amendment Right to Petition Government

¶ 32 Certain appellants complain of a violation of the right guaranteed them by the First Amendment to the United States Constitution to petition the government for a redress of their grievances. They misunderstand this right.

¶ 33 "The right to petition bars state action interfering with access to the legislature, the executive branch and its various agencies, and the judicial branch," *Ruiz v. Hull,* 191 Ariz. 441, 457 ¶ 61, 957 P.2d 984, 1000 (1998) (citations omitted), *cert. denied,* 525 U.S. 1093, 119 S.Ct. 850, 142 L.Ed.2d 703 (1999), but there has been no interference with access in this case. There are no allegations that any individual was denied an opportunity to be heard by either the executive or legislative branches of government, and, certainly, it is evident that they enjoy access to the judicial branch. There is only the vague and speculative assertion by these individuals that access might be denied them because, should the Pima County Board of Supervisors be given a petition to incorporate a town or municipality and if the neighboring urban area refuses consent to the incorporation, the petition is of no practical effect by operation of A.R.S. section 9–101.01. A hypothetical potential lack of success, however, does not equate to the denial

of the right to petition, particularly when there has been no concomitant deprivation of an individual right to speech or association. *See WMX Technologies, Inc. v. Miller,* 197 F.3d 367, 372 (9th Cir.1999).

### E. *Tucson's Refusal to Consent to Tortolita's Incorporation*

¶ 34 Tortolita argues that Tucson acted in bad faith in refusing to consent to Tortolita's incorporation, thus making A.R.S. section 9–101.01(B)(1) unconstitutional as applied. However, Tucson's exercise of consent pursuant to section 9–101.01(B)(1) is a delegated legislative duty, *Pickrell,* 102 Ariz. at 363, 430 P.2d at 125, and we neither can nor should inquire into the intent of such legislative action because it would violate the doctrine of the separation of governmental powers. *Wait v. City of Scottsdale,* 127 Ariz. 107, 108, 618 P.2d 601, 602 (1980) ("Since we hold that the decision to rezone is a legislative one, neither the motives of the councilmen in denying the application for rezoning nor the reasons that were spread before them to induce the denial of the rezoning request are proper subjects for judicial inquiry."); *Austin v. Campbell,* 91 Ariz. 195, 204, 370 P.2d 769, 776 (1962) (alleged bad faith of legislators in enacting statute cannot be examined by Arizona courts); *Taylor v. City of Chandler,* 17 Ariz.App. 346, 348, 498 P.2d 158, 160 (1972) ("[O]ur courts are not concerned with the motive, wisdom or reasonableness of the annexation.").

¶ 35 Additionally, in *Woods,* we held that A.R.S. section 9–101.01 is not unconstitutional in delegating to "urbanized areas" the discretion whether to grant consent to neighboring municipal incorporations. 191 Ariz. at 532, 959 P.2d at 403, citing *Garrett,* 77 Ariz. 73, 267 P.2d 717 (legislature may delegate to municipality complete discretion whether to grant annexation). We will not analyze Tortolita's allegations of Tucson's bad faith.

### CONCLUSION

¶ 36 The judgment is affirmed. This case is remanded to the superior court for such further proceedings as remain necessary.

CONCURRING: JAMES B. SULT, Judge, CECIL B. PATTERSON, Jr., Judge.